IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

TRIDENT-BRAMBLETON, L.L.C.,        )
    Plaintiff and               )
    Counter Defendant,          )
                                )
v.                                 ) 1:05cv1423
                                )
PPR No. 1, L.L.C.,                 )
    Defendant and               )
    Counter Claimant,           )
                                )
v.                                 )
                                )
TRIDENT PROPERTIES, INC.,          )
    Counter Defendant.          )

MEMORANDUM OPINION

Before the Court are the counter-defendants Trident-
Brambleton, LLC and Trident Properties, Inc.'s Motion for Summary
Judgment (Docket #100), the counter-claimant PPR No. 1, LLC's
Motion to Strike Reply Memorandum (Docket #112) and the counter-
claimant's Motion for Leave to File Surreply (Docket #111).

I. Factual Background

Trident-Brambleton, LLC ("Trident"), is the majority owner
and managing member of the Brambleton Group, LLC ("TBG").  TBG
was created in 1999 to purchase, develop, and re-sell a 2,007
acre tract of land in Loudoun County, Virginia ("the Property").
The other members of TBG are PPR No. 1, LLC ("PPR"), and Lontray
Enterprises, LLC ("Lontray"), which is not a party to this

litigation.

In 1999, Jack Pogue, a real estate investor and real estate broker, had an option to buy the Property.  TBG was created to provide financing to buy and develop the Property.  Trident put up most of the money to buy the Property, and Pogue, through his affiliate PPR, contributed the option contract.  On March 19, 1999, the parties signed the Operating Agreement of TBG.  The Operating Agreement provides that Trident is the managing member, with unilateral control over the day to day operations of TBG. Section 4.01 of the Operating Agreement gives Trident the exclusive right to "sell, exchange, or in any manner dispose of the Property or any portion thereof or interest therein, any development on the Property and all other assets and properties of the Company, including the sale of all or any portion of the Property to an Affiliate..."

In addition to PPR's interest in TBG, the Operating Agreement entitled a second affiliate of Jack Pogue, Jack Pogue & Company, to act as exclusive sales agent with regard to sales of the Property and to receive certain commissions in conjunction with such sales.  In or around February of 2004, Trident informed Pogue that TBG would no longer pay commissions to Jack Pogue & Company.  In May of 2004, Jack Pogue & Company filed suit in Loudoun County Circuit Court to enforce its right to the commissions.  That lawsuit is scheduled to go to trial in state

2

court in August of 2006.

PPR alleges that during discovery in the state case, it became aware of various actions by Trident that violated the Operating Agreement and breached Trident's fiduciary duties to the members of TBG.  Specifically, PPR alleges that Trident sold TBG's options to buy adjacent properties[1] to Brambleton Land Acquisition Associates, LLC ("BLA"), an affiliate of Trident, for less than fair market value.[2]  PPR alleges in its counterclaim that in making these transactions, Trident breached various common law, statutory, and contractual duties that it owed PPR. Specifically, Count I alleges breach of the Operating Agreement, Count III alleges a common law breach of fiduciary duty, Count IV alleges breach of Michigan's statutory requirement that the manager of an LLC carry out its duties in good faith, with due care, and in the best interests of the LLC, Count V alleges breach of a Michigan statute that prohibits the managing member of an LLC from taking "willfully unfair and oppressive" actions against another member of the LLC, and Count IX seeks to hold

---

[1]The adjacent properties at issue in this civil action are known as the Franz, Stone, and Fosdick properties reflecting the names of their prior owners.

[2]The documents submitted with the briefs establish that BLA reimbursed TBG for its costs in buying the options and conducting due diligence.  However, BLA may not have reimbursed TBG for its payment of property taxes on the optioned properties.  PPR's evidence indicates that TBG continued to pay property taxes on the Franz, Stone, and Fosdick properties even after the options to buy those properties were transferred to BLA.

Trident Properties liable on its guarantee of Trident's performance under the Operating Agreement.[3]  Trident moves for summary judgment on all of these counts arguing that 1) PPR lacks standing to raise these claims; 2) PPR's claims are barred by the applicable statute of limitations; and 3) Trident has not, as a matter of law, violated any duties to PPR because the Operating Agreement explicitly authorizes it to act in the manner it has with respect to the options on the Stone, Franz and Fosdick parcels.[4]

II. Analysis

   A. Standing of PPR to sue for wrongs to TBG

   Trident argues that PPR lacks standing to bring the alleged claims because they are derivative claims, and PPR has not followed the proper procedures for bringing a derivative suit.

---

[3]PPR's counterclaims, as originally filed, consisted of nine separate counts alleging not only the instant claims but also a number of claims seeking to prevent Trident from moving forward with a proposed sale of the entire Property to an affiliate of Trident.  On April 14, 2006, the Court granted Trident's Motion for Summary Judgment (Docket #46) on all of the claims related to the proposed sale of the Property.  The Court allowed the counterclaims to proceed "to the extent that they allege misconduct by Trident-Brambleton related to the smaller parcels of land."  The parties agree that the still-viable claims are claims I, III, IV, V, and IX, to the extent they allege misconduct related to the transfer of options to by the Franz, Stone, and Fosdick parcels.

[4]The Operating Agreement provides, and the parties do not dispute, that the substantive law of Michigan is to be applied to the claims in this civil action.

Trident points out that, if it violated its fiduciary duties and duties of good faith in assigning the options for less than their fair market value, it is TBG, and not PPR individually that was harmed.  Therefore, Trident argues, PPR may only bring suit to redress this harm by complying with MCL § 450.4510, which governs derivative suits by members of an LLC.  PPR acknowledges that it has not complied with the procedural requirement of MCL § 450.4510 that a written demand be made to managers requesting that the LLC sue in its own right before a member may initiate a derivative suit.

Although the standing argument has merit with respect to Counts III and IV, it does not justify judgment in Trident's favor on Count V.  Count V alleges that Trident engaged in "willfully unfair and oppressive conduct" against PPR.  MCL § 450.4515 specifically states that, "A member of a limited liability company may bring an action...to establish that acts of the managers or members in control of the limited liability company are illegal or fraudulent or constitute willfully unfair and oppressive conduct toward the limited liability company or the member."  This statute clearly gives the individual member a cause of action.  Therefore, there is no question that PPR has standing to assert the claims alleged in Count V.[5]

---

[5]PPR also asserts that, as a signatory to the Operating Agreement, it clearly has standing to raise claims of breach of that agreement (Counts I and IX).  The Court agrees that PPR has

With respect to Counts III and IV, PPR argues that Trident waived the standing argument by failing to assert it as an affirmative defense in its Answer to the counterclaim.  Fourth Circuit case law holds that an affirmative defense not asserted in an initial pleading may be asserted in a pre-trial dispositive motion unless the delay causes unfair surprise or prejudice to the opposing party.  Brinkley v. Harbour Recreation Club, 180 F.3d 598, 612 (4th Cir. 1999), abrogated on other grounds by Desert Palace Inc. v. Costa, 539 U.S. 90 (2003).  PPR argues that it is prejudiced by the late assertion of lack of standing because it is too late for PPR to amend its counterclaim to assert derivative causes of action and it has been forced to engage in costly discovery that would have been unnecessary if Trident had earlier raised this issue and the Court had ruled in Trident's favor at that time.  PPR requests leave to amend if the Court finds that Trident has not waived the standing argument as to counts III and IV.

Because PPR clearly has standing to bring Counts I, V, and IX, and Trident delayed in asserting that PPR's other claims should have been brought by way of a derivative suit, and because the Court finds other, more significant defects with PPR's claims, the Court will not grant summary judgment on this

---

standing to assert its claims of breach of the Operating Agreement.

6

ground.[6]

B. Statute of Limitations

Trident persuasively argues that Counts III, IV and V of PPR's counterclaim are barred by the statutes of limitations that apply to those claims.  The statutory claims brought in Counts IV and V are subject to almost identical statutes of limitations. MCL § 450.4515 (the basis for Count V) provides, "An action seeking an award of damages must be commenced within 3 years after the cause of action under this section has accrued or within 2 years after the member discovers or reasonably should have discovered the cause of action under this section, whichever occurs first."  MCL § 450.4404 (the basis for Count IV) provides that, "An action against a manager...shall be commenced within 3 years after the cause of action has accrued or within 2 years after the cause of action is discovered or should reasonably have been discovered by the complainant, whichever occurs first." Count III (breach of common law fiduciary duty) is governed by

_____

[6]Trident suggests in its initial brief that this court lacks jurisdiction to consider Count V because Michigan law requires that suits for violations of the statute be brought "in the circuit court of the county in which the limited liability company's principal place of business or registered office is located."  MCL §§ 450.4515.  This argument fails because the statute simply provides that a suit "may" be brought in such circuit court, and does not explicitly provide that such court has exclusive jurisdiction over suits under that section.  In addition, Trident cites no authority to support this argument, which would require the Court to hold that the Michigan legislature can restrict the diversity jurisdiction of the federal courts.

Virginia's 2 year "catch-all" statute of limitations.

The transactions that PPR claims were not proper occurred on June 25, 2002, July 31, 2002, and January 15, 2003, respectively, when TBG assigned its options to buy the three properties to BLA. As of those dates, PPR had suffered whatever damages it claims. PPR filed its counterclaims in this matter on January 13, 2006.

i. Count III - Virginia statute of limitations

The parties agree that based on Virginia choice of law principles, the proper statute of limitations to apply to Count III, which alleges a common law breach of fiduciary duty, is Virginia's two year "catch-all" statute.  Clearly the claims relating to each parcel accrued more than two years before PPR filed its counterclaims.  PPR argues, however, that Count III is not time-barred because the existence of the cause of action was fraudulently concealed by Trident.  Virginia law provides that, "[w]hen the filing of an action is obstructed by a defendant's...using any other direct or indirect means to obstruct the filing of an action, then the time that such obstruction has continued shall not be counted as any part of the period within which the action must be brought."  Va. Code § 8.01-229(D).

PPR supports its claim of fraudulent concealment by arguing that the sale of the options to BLA was not disclosed under Note 4 "Related Party Transactions" in TBG's financial statements for

8

the years at issue.  It also relies on a conversation Pogue had in January of 2003 with Bill Fox, who worked for Trident-Brambleton proposing and managing development plans for the Brambleton Property.  In this conversation, Fox told Pogue that Anthony Soave, the primary owner of Trident-Brambleton and the source of funding for TBG's development of the Brambleton Property, wanted to buy the Franz, Stone and Fosdick properties himself, without the participation of PPR and Lontray. By January of 2003, TBG had already transferred two of the options to BLA, and BLA had closed on those two properties, and in that same month TBG transferred the Stone option to BLA and BLA closed on that property.  PPR argues that Fox misrepresented to Pogue the status of the options, implying that TBG still owned them, but that Soave wanted, in the future, to buy the properties himself. In deposition testimony, representatives of TBG/Trident could not explain why the transfer of options did not appear in the "Related Party Transactions" section of TBG's financial disclosures.

The Virginia Supreme Court has recently reviewed the standard for tolling a statute of limitations under Va. Code § 8.01-229(D).  The court has explained, "Mere silence by the person liable is not concealment, but there must be some affirmative act or representation designed to prevent, and which does prevent, the discovery of the cause of action."  Newman v.

Walker, 618 S.E.2d 336, 338 (Va. 2005)(quoting Culpepper Nat'l
Bank v. Tidewater Improvement Co., 89 S.E. 118 (Va. 1916)).
Under the court's reasoning both an "affirmative act of
misrepresentation" and an act "designed or intended, directly or
indirectly, to obstruct" must be present to toll the statute.
Id. at 340.

    In this case, Trident's failure to disclose the transactions
in TBG's financial statements constitutes "mere silence."
Furthermore, Fox's alleged statements,[7] actually provided Pogue
with information that should have made him *more*, not less,
suspicious of Soave's actions with regard to those three
properties.  Fox told Pogue that Soave wanted to buy the
properties himself.  As Trident points out, Pogue had
relationships with the sellers, access to Loudoun County land
records, and the right, as a member of TBG, to inspect the books
upon demand.  Far from fraudulently concealing the insider
transaction, if Fox made the statement he would have assisted
Pogue in suspecting that such a transaction might be in the
works.  That two of the option sales had already occurred does
not establish that Fox, or Trident, intentionally acted to keep
that information away from Pogue.

    For these reasons, the Court finds that the tolling

_____

    [7]PPR did not attach any deposition transcripts in which Fox
confirmed or denied the conversation alleged by Pogue.

provision is not applicable, and that the claims of Count III are barred by the Virginia statute of limitations.

      ii. Counts IV and V - Fosdick and Franz options

The Fosdick and Franz option transfers occurred more than 3 years before PPR filed its counterclaim. Therefore, they are barred by the statute of limitations provided in MCL §§ 450.4515 and 450.4404, unless the statutes are tolled. Michigan, like Virginia, has a tolling provision which provides that,

> [i]f a person who is or may be liable for any claim fraudulently conceals the existence of the claim...the action may be commenced at any time within 2 years after the person who is entitled to bring the action discovers, or should have discovered, the existence of the claim...although the action would otherwise be barred by the period of limitations.

MCL § 600.5855.

Trident argues that the Michigan statutes at issue function as statutes of repose in addition to statutes of limitations, and that therefore, MCL § 600.5855 is inapplicable to PPR's claims. Alternatively, they argue that PPR has not shown there was any fraudulent concealment.

In Baks v. Moroun, 576 N.W.2d 413 (Mich. App. 1998),[8] the Court of Appeals of Michigan held that the fraudulent concealment statute did not apply to causes of action under a portion of the Michigan Business Corporation Act. The court held that,

---

    [8]Baks has been partially overruled by Estes v. Idea Eng. & Fabricating, Inc., 649 N.W.2d 84 (Mich. App. 2002), however the ruling with respect to fraudulent concealment is still good law.

> any claims against corporate officers and directors
> that are subject to the limitation period found in §
> 541a(4) are barred more than three years after the date
> of the occurrence, regardless of when the plaintiff
> learned of the breach of duty and despite the fact that
> corporate officers and directors may have fraudulently
> concealed the occurrence.

<u>Id.</u> at 421.  The court based this holding on its determination

that the statute is a statute of repose, as opposed to a statute

of limitations.  The court further explained that its holding was

based on precedent which had not been disturbed by the Michigan

legislature for over forty years.

Although the <u>Baks</u> decision did not address the statutes

involved in this case, Trident provides sound reasons for

interpreting the language of MCL §§ 450.4515 and 450.4404 in the

same manner as the Michigan courts have interpreted the language

of MCL § 450.1541a.  Sections 450.4404 and 450.1541a are directly

analogous statutes and all three statutes use virtually the exact

same words regarding when an action is time-barred.  MCL §

450.1541a requires that officers and directors of a corporation

discharge their duties in good faith, with the care of an

ordinarily prudent person in like circumstances, and in a manner

he/she reasonably believes to be in the best interests of the

corporation.  MCL § 540.4404 imposes precisely the same duties on

managers of a limited liability company.  Section 541a contains

the limitation that,

> [a]n action against a director or officer for failure
> to perform the duties imposed by this section shall be

12

> commenced within 3 years after the cause of action has
> accrued, or within 2 years after the time when the
> cause of action is discovered or should reasonably have
> been discovered, by the complainant, whichever occurs
> first.

MCL § 450.4404 mirrors this language exactly and provides that,

> [a]n action against a manager for failure to perform
> the duties imposed by this act shall be commenced
> within 3 years after the cause of action has accrued or
> within 2 years after the cause of action is discovered
> or should reasonably have been discovered by the
> complainant, whichever occurs first.

Section 450.4515 again uses almost exactly the same language[9] to limit the time period in which claims for damages may be filed.

Additionally, subsequent decisions of the Michigan courts and acts of the Michigan legislature support the conclusion that the Baks holding should apply with equal force to causes of action under MCL § 450.4515.  MCL § 450.1489, the section of the Michigan Business Corporation Act that is analogous to MCL § 450.4515,[10] was the subject of Estes v. Idea Eng. & Fabricating,

---

[9]MCL § 450.4515 provides that, "[a]n action seeking an award of damages must be commenced within 3 years after the cause of action under this section has accrued or within 2 years after the member discovers or reasonably should have discovered the cause of action under this section, whichever occurs first."

[10]MCL § 450.4515 provides a cause of action to a member of a limited liability company when "acts of the managers or members in control of the limited liability company are illegal or fraudulent or constitute willfully unfair and oppressive conduct toward the limited liability company or the member."

MCL § 450.1489 provides a cause of action to shareholders of corporations whose shares are not publicly traded when "the acts of the directors or those in control of the corporation are illegal, fraudulent, or willfully unfair and oppressive to the corporation or to the shareholder."

13

Inc., in which the Court of Appeals of Michigan held that suits under that section were not subject to the same statute of limitations as § 541a claims. 649 N.W.2d 84 (Mich. App. 2002). However, at the time the court decided Estes, § 489 did not explicitly contain a statute of limitations at all.[11]  After the Estes decision, the Michigan legislature amended § 489 to add the same limiting language as found in § 541a and as is currently found in MCL §§ 450.4404 and 450.4515 as well.  This action by the Michigan legislature demonstrates its intent that these statutes be subject to the same statutes of limitation and repose.

Although the Michigan courts do not appear to have ruled on whether the limiting language of §§ 450.4515 and 450.4404 constitutes both a statute of limitations and a statute of repose, it is reasonable to assume that by using identical language in the Limited Liability Company Act as already existed in the Business Corporation Act, the legislature intended to give managers of limited liability companies the same repose that it afforded managers and officers of corporations.  Therefore, the Court finds that the three year statute of limitations in MCL §§ 450.4515 and 450.4404 cannot be tolled by fraudulent concealment.

---

[11]The Estes court therefore held that, rather than being subject to the statute of limitations expressed in § 541a, causes of action under § 489 were subject to Michigan's more general six year statute of limitations for causes of action created by statute.  649 N.W.2d at 85.

14

For these reasons, PPR's claims under Counts IV and V as to the Franz and Fosdick parcels are time-barred.

### iii. Counts IV and V - Stone

The Stone option was transferred on Jan. 15, 2003.  The counterclaim was filed on Jan. 13, 2006.  Therefore, with respect to the Stone property, PPR's claims are within the 3 year statute of repose.  However, the Michigan statutes provide that the claims must be filed within 2 years of discovery or within 3 years of accrual, whichever is *shorter*.  Therefore, the Court must consider when PPR knew or should have known that it had a cause of action.

Trident argues that by February of 2003, PPR should have known it had a cause of action.  Pogue himself has alleged that in January of 2003, Fox told him that Soave wanted to buy the properties personally.  In addition, Pogue appears to have known that the properties were in fact closed upon by some entity.  Pogue stated in his deposition, and in a letter of February 14, 2003, that Bob Stone had called to "thank me for the work I did in selling his property" and that Pogue assumed that TBG had closed on the property.  <u>See</u> Ex. 8, Trident Mem. In Supp.  On this record it is clear that by February of 2003, Pogue knew that at least one of the properties had been sold, and had been warned by a Trident-affiliated person that Soave wanted to buy the properties in his own name rather than on behalf of TBG.  Through

public sources, such as Loudoun County property records, Pogue could have discovered the purchaser of the properties.  PPR also could have demanded, as a member of TBG, to inspect its records.  Based on these facts, Trident argues that the two year statute of limitations began to run in February of 2003, and therefore PPR's claims as to the Stone property are also time-barred.

Trident's argument is supported by the Baks decision, which also addressed the question of when the "discovery period" begins to run for purposes of the statute of limitations.  In Baks, the manager/shareholder of a closely held corporation had proposed to have his son's trust, rather than the closely held corporation, buy certain shares of a different corporation.  One of the shareholder/directors, who was also a trustee of the boy's trust, objected that the manager was usurping a corporate opportunity in favor of his son's trust, and refused to authorize the deal as trustee of the trust.  The sibling/shareholders believed that the manager/brother had then backed off on his proposed usurpation of corporate opportunities, but in fact he bought the shares with a different related entity (not the son's trust).  The Baks court upheld the trial court's decision that the discovery period began when the shareholders knew of the manager's intention to usurp corporate opportunities.  In other words, the fact that the manager had apparently backed off but actually usurped opportunities in a different manner did not prevent the statute

16

of limitations from beginning to run.

Trident argues persuasively that the instant case is very similar to the Baks situation.  PPR knew, in February of 2003, that Soave wanted to buy the properties himself.  PPR could have further investigated and determined the actual disposition of the property if it was so inclined.  Therefore, the cause of action was "discovered" for purposes of the statute of limitations, and is time barred.[12]

Giving PPR the benefit of the doubt, and considering that it is not entirely clear from the Michigan case law what part of the § 541a statute was held to be a statute of repose, the Court concludes that only the three year requirement should be treated as a statute of repose, and that the two year requirement should be considered a traditional statute of limitations that can be tolled by the fraudulent concealment statute.  Therefore, because with respect to the Stone property Counts IV and V were asserted within three years of the option's transfer, the Court must address whether fraudulent concealment tolled the statute of

---

[12]In its surreply, PPR argues that the instant case can be distinguished from Baks because in Baks the court noted that the sibling shareholders knew that the manager/brother had been lying and doing improper things for some time, and thus their assertion that they just believed him when he said he would not go forward with the usurping deal was disingenuous.  Here, PPR argues it had no reason to distrust Fox's representation or Trident's intentions.  This argument is not persuasive given the discussion Pogue had with the owner of the Stone property and the ease with which he could have determined the buyer.

17

limitations with respect to that claim.

Using an approach similar to the Virginia Supreme Court, the Court of Appeals of Michigan has found that, "[f]raudulent concealment means employment of artifice, planned to prevent inquiry or escape investigation and mislead or hinder acquirement of information disclosing a right of action." Studio B Architects, Inc. v. Paradis Assocs., Inc., No. 261385, 2005 WL 3193676 (Mich. App. Nov. 29, 2005) (unpublished) (quoting DeHaan v. Winter, 241 N.W. 923 (Mich. 1932)). Given the similarity of this reasoning to Virginia's approach to fraudulent concealment, and for the same reasons discussed with regard to Count III, supra, the Court finds that PPR has failed to adduce sufficient evidence of fraudulent concealment to avoid summary judgment. Fox's statements actually should have put Pogue on notice of a potentially inappropriate deal being in the works. In addition, the omission of the transactions from the financial statements cannot be considered a sufficiently affirmative act or artifice "planned to prevent inquiry or escape investigation."

C. Merits

    i. Facts

To better understand the facts, the following chart demonstrates the key facts as to each parcel of property. The parties do not dispute these facts.

18

| Prop. at issue | TBG buys option | Price of option | Assessed value on 6/13/02[13] | Purch. price in option | option transf. | prop. purch'd by BLA |
|---|---|---|---|---|---|---|
| Franz | 1/2001[14] | $39,000 | $430,000 | $750,000 | 7/31/02 | 7/31/02 |
| Stone | 1/2001[15] | $52,000 | $200,000 | $371,460 | 1/15/03 | 1/22/03 |
| Fosdick | 6/29/01 | $30,000 | $180,000 | $389,975 | 6/25/02 | 6/28/02 |

As shown in the chart, on the dates indicated in the second column, TBG bought the option for the price indicated in the third column. TBG also spent money on various tests and assessments in the course of performing due diligence on whether the properties would be a good investment. The persons conducting the due diligence were apparently people who regularly worked for Trident in its capacity as managing member of TBG. In addition, the same person, Edward R. Schonberg, signed the assignment document for both TBG and BLA. He signed the document representing himself as Vice President of each of those two entities. See Exs. 5, 6, 7 of Trident's Mem. in Supp. The deposition testimony establishes that BLA paid TBG its costs for the options, including surveys and assessments performed on the parcels. It does not, however, appear that BLA reimbursed TBG

---

[13]The appraised values are derived from three separate appraisals prepared by CB Richard Ellis, Inc. for TBG.

[14]This option was initially purchased in Jan. 2001 for $26,000 and then extended in March 2002 for an additional $13,000.

[15]This option was also purchased in Jan. 2001 for $26,000 and was then extended in Jan. 2002 for an additional $26,000.

for real estate taxes paid on the properties, and there is
evidence in the record that TBG continued to pay real estate
taxes on the properties even after BLA bought them.  PPR has not
emphasized this fact in its briefs, but it is supported by the
accompanying documents and deposition transcripts.

ii. Analysis

PPR alleges that Trident breached fiduciary duties implied
in the Operating Agreement, established in common law, and
codified by Michigan statutes when it sold TBG's options to by
the Franz, Stone, and Fosdick properties to a Trident affiliate
at cost.  Trident argues that judgment should be entered in its
favor because the Operating Agreement gives Trident absolute
discretion to engage in such transactions on behalf of TBG and
specifically provides that Trident's decisions will be
"controlling and binding upon the Company."  § 4.01.  Trident
argues that this language conclusively establishes that it did
not breach the Agreement, and that the parties intended, when
contracting, that Trident not be bound by common law and
statutory fiduciary duties when engaging in such transactions.

Although the Agreement clearly gives Trident unilateral
authority over the day to day operational decisions associated
with TBG, the Agreement does not explicitly release Trident from
the duty to act in good faith and in the best interests of TBG,
nor does it protect Trident against claims of oppressive conduct

20

toward non-managing members.  In fact, the Agreement provides
that, "Trident and/or a Member shall not be liable to the Company
or any other Member by reason of any act performed for or on
behalf of the Company or in furtherance of the Company's
business, or any omission to act, except for acts and omissions
that constitute willful misconduct, gross negligence, fraud or
bad faith."  § 8.01.  This language is consistent with a
recognition that Trident has a duty to act in good faith.
However, the Agreement specifically abrogates the usual common
law fiduciary duty not to usurp opportunities of the LLC by
providing that,

> a Member and its Affiliates shall be entitled to obtain
> and/or continue their respective individual
> participation in all such ventures [those competitive
> with the Company] without (i) accounting to the Company
> or the other Members for any profits or other economic
> gain with respect thereto, (ii) any obligation to
> advise the other Member of business opportunities for
> the Company which may come to its or its Affiliate's
> attention as a result of its or its Affiliate's
> participation in such other ventures or in the Company,
> and (iii) being subject to any claims of any nature
> whatsoever on account of such participation.

§ 4.03(b).

Given this specific contractual language, the Court finds
that the parties agreed to bypass statutory or common law
fiduciary duties with respect to competing ventures.  In
particular, had Trident simply learned of the possibility of
buying the Franz, Stone and Fosdick properties through the course
of its business on behalf of TBG, and directly purchased such

21

properties in the name of an affiliate, it would not have
breached the Agreement, or any fiduciary duties, since the
contract has explicitly abrogated the usual duty not to usurp
opportunities of the company.  However, this is not what Trident
did.  Trident caused TBG to buy the options at issue, and then
transferred the options to an affiliate.  Although PPR may not,
due to the contractual language, argue that Trident/BLA usurped a
corporate opportunity (for which the damages could include lost
profits), it may argue that Trident breached its duty of good
faith by selling an asset of TBG below market value.

Although this aspect of PPR's theory of the case is viable,
there are two flaws in PPR's position.  First, lost profits are
not an appropriate measure of damages for a failure to sell the
options for their fair market value.  The harm to TBG, and by
extension to PPR, is the difference between the price at which
the options were sold and their market value, not the potential
profits to be made by developing the real estate.  Pogue, in his
estimates, appears to use the resale value of the property after
improvements as his basis for assessing the value of the options,
valuing the options at the total profit likely to be made.  To
allow lost-profit damages would allow PPR to in effect sue
Trident for usurpation of a corporate opportunity when the
Operating Agreement specifically states that Trident is allowed
to usurp corporate opportunities of TBG.

22

Second, PPR has presented insufficient evidence of the fair market value of the options at the time they were transferred from TBG to BLA.  It has presented documents showing various projections by Trident employees of potential profits to be derived from developing the land and an affidavit of Jack Pogue in which he values the options as worth several million dollars. However, deposition transcripts establish that Pogue is simply a real estate broker with significant experience in Northern Virginia and is not skilled or certified in performing assessments or valuations of property, let alone options to buy property.  In its surreply, PPR focuses on those portions of Pogue's affidavit where he explains his valuation of the options. This evidence makes it clear that Pogue based his valuation on the expected profit to be made from improving and selling the property to builders.

Trident, on the other hand, has provided a professional assessment of each parcel at issue, as evaluated in June of 2002. Each of the parcels is valued significantly *lower* than the purchase price stated in the option to buy.  On the basis of that evidence TBG actually transferred to BLA the opportunity to buy properties at significantly above market price.  PPR argues that the methodology of these valuations was flawed in that it assessed only the value of the land as-is and did not account for zoning changes which would allow more homes to be built on the

23

properties, and which were very likely to occur in the near future.  Given the lack of expert evidence of value by PPR and the expert evidence of Trident, PPR cannot establish damages.

Moreover, as Trident explains, TBG benefited from these transactions by preventing "unfriendly" buyers from obtaining properties adjacent to TBG's property.  This benefit was maintained by TBG even after the transfer of the options to BLA. Therefore, in addition to being reimbursed for buying the options and the costs of due diligence, TBG benefitted from the assurance that the properties would not be developed in a manner antagonistic to TBG's main asset, the Property, when it transferred the options at cost to BLA.  PPR has produced no evidence other than Jack Pogue's affidavit to support its contention that the options were worth vastly more than BLA paid for them.

Because PPR has failed to adduce evidence sufficient to allow a jury to conclude that Trident breached the Agreement, breached its fiduciary duties, and that TBG suffered damages due to the transfer of the options, summary judgment will be granted in favor of the counter-defendants.[16]

_____

[16]PPR also argues in its surreply that Trident did not raise the issue of ability to prove damages as a ground for moving for summary judgment.  Although it was certainly not Trident's primary argument, it was raised in the briefing, as evidenced by PPR's attempt to refute the charge.

III. Conclusion

For the above stated reasons, as well as those discussed in open court, the counter-defendants' Motion for Summary Judgment will be granted by an accompanying Order.

Entered this 5th day of July, 2006.


_____/s/_____
Leonie M. Brinkema
United States District Judge

Alexandria, Virginia